# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: January 20, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| PAULA DEBUSK, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | No. 20-1470V |
| | * | |
| v. | * | Special Master Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Fact Ruling; Influenza ("Flu") Vaccine; |
| AND HUMAN SERVICES, | * | Shoulder Injury Related to Vaccine |
| | * | Administration ("SIRVA"); Site of |
| Respondent. | * | Administration; Onset. |
| | * | |
| * * * * * * * * * * * * * * | * | |

Jessica Anne Olins, Maglio Christopher & Toale, Seattle, WA, for Petitioner.
Lara A. Englund, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON FACTS**[1]

On October 27, 2020, Paula DeBusk ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012).[2] Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccination she received on September 18, 2018. Petition at 1-2 (ECF No. 1).

Prompting this fact ruling, Respondent filed an unopposed motion to amend the schedule and have the Court resolve the factual issues raised in Respondent's Rule 4(c) Report before

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

1

proceeding to expert reports. Respondent's Unopposed Motion to Amend Schedule ("Resp. Mot. to Amend"), filed May 24, 2022 (ECF No. 37). Thereafter, a status conference was held during which the parties agreed for the special master to rule on both the site of administration of the vaccine and the site (location) of Petitioner's first symptoms. Order dated June 9, 2022 (ECF No. 38).

After a review of the record as a whole, and for the reasons set forth below, the undersigned finds by preponderant evidence that (1) Petitioner received the flu vaccine in her left shoulder, and (2) her initial symptoms were in her left shoulder within 48 hours of vaccination.

## I. PROCEDURAL HISTORY

On October 27, 2020, Petitioner filed a petition for compensation alleging a left SIRVA as a result of her September 18, 2018 flu vaccination. Petition at 1-2. Petitioner filed medical records shortly thereafter. Petitioner's Exhibits ("Pet. Exs.") 1-12. This case was assigned to the special processing unit ("SPU") on November 30, 2020. SPU Initial Order dated Dec. 1, 2020 (ECF No. 10). Subsequent medical records were filed from May 2021 to September 2021. Pet. Exs. 13-17. Respondent filed his Rule 4(c) Report on February 10, 2022 arguing against compensation. Resp. Report ("Rept.") at 1, 7 (ECF No. 26). Particularly, Respondent argued that Petitioner has not established that she suffered a Table injury because "the record does not demonstrate that [P]etitioner's pain was limited to the shoulder in which the vaccine was given."[3] Id. at 8. Respondent reasoned (1) "there is conflicting evidence regarding both the site of vaccination, and the site of [P]etitioner's initial symptoms," and (2) "in addition to shoulder pain, [P]etitioner also reported pain that traveled down her arm to her elbow, and pain that affected her upper back, neck, trapezius, and her whole left side." Id. at 8-9.

This case was reassigned to the undersigned on March 16, 2022. Notice of Reassignment dated Mar. 16, 2022 (ECF No. 28). Petitioner filed additional medical records on April 28 and 29, 2022, and filed an expert report on May 16, 2022. Pet. Exs. 18-24. On May 24, 2022, rather than filing a responsive expert report, Respondent filed an unopposed motion to amend the schedule and suspend the deadline for filing a responsive expert report. Resp. Mot. to Amend. Respondent believed it would be more efficient for the Court to resolve the factual issues regarding the site of vaccine administration and the site (location) of Petitioner's initial symptoms before proceeding to expert reports. Id.

The undersigned held a status conference on June 9, 2022 to discuss Respondent's position. Order dated June 9, 2022. After some discussion, Petitioner stated she was amenable to filing a motion for a finding of fact and for the special master to rule on the site of both the administration of the vaccine and Petitioner's first symptoms.[4] Id. The parties agreed that after

---

[3] Respondent also argued Petitioner has not established a causation-in-fact-claim. Resp. Rept. at 9-10.

[4] The issue of whether Petitioner had a cervical radiculopathy is not decided in this Fact Ruling. See Order dated June 9, 2022.

2

filing their briefs, the undersigned would deliver a telephonic bench ruling with a court reporter present. Id.

On July 11, 2022, Petitioner filed her motion for findings of fact regarding onset and site of administration and a supporting memorandum. Pet. Mot. for Findings of Fact ("Pet. Mot."), filed July 11, 2022 (ECF No. 40); Pet. Memorandum ("Pet. Memo."), filed July 11, 2022 (ECF No. 39). On August 8, 2022, Respondent filed his response to Petitioner's motion for findings of fact regarding onset and site of administration. Resp. Response to Pet. Mot. ("Resp. Response."), filed Aug. 8, 2022 (ECF No. 41). No reply brief was filed.

On January 10, 2023, the undersigned informed the parties that a written ruling memorializing the undersigned's findings would be more efficient than an oral ruling at this time. Order dated Jan. 10, 2023 (ECF No. 42). The parties had no objections. Pet. Joint Status Rept., filed Jan. 10, 2023 (ECF No. 43).

This matter is now ripe for adjudication.

## II.     RELEVANT FACTUAL HISTORY[5]

Petitioner received her flu vaccine on September 18, 2018 at her primary care provider's ("PCP") office. Pet. Ex. 1 at 5. The contemporaneous vaccination record indicates that the vaccine was administered in her right deltoid. Id. On February 11, 2020, Mia Sutfin, Registered Nurse ("R.N."), the nurse who administered Petitioner's vaccine on September 18, 2018, created a "Comment History" stating that this was an error, and that the vaccine was actually given in Petitioner's left deltoid. Id. at 6. Ms. Sutfin noted,

> After reviewing [Petitioner's] immunization records where [Petitioner] had the [flu] vaccine on 9/18/2018 I realized there was a documentation error. I documented the [flu] vaccine was administered in the right deltoid when it was administered in the left deltoid. I annotated this as well on the [flu] vaccine order that shows documentation on 9/18/2018.

Id. Petitioner was 64 years old at the time of vaccination and had no documented history of prior shoulder pain. See Pet. Ex. 3 at 5 ("denies pain or problems prior to the vaccine").

On September 24, 2018, six days after vaccination, Petitioner called her PCP's office indicating that the "[f]lu shot site [was] painful" and reported that it "bruised at first." Pet. Ex. 16 at 107. She did not report any swelling, redness, or signs of infection. Id. There was no mention of which arm she was talking about other than "[f]lu shot site." Petitioner again called the following day stating that she was "still having bad arm pain" and requested to be seen. Id. at 102.

---

[5] This medical history is limited to the records relevant to the site of the vaccination and the location and timing of Petitioner's first symptoms.

3

On September 25, 2018, Petitioner saw her PCP, Dr. Allison Johnson, an internist, at the same office where she received her vaccine. Pet. Ex. 4 at 11. "History of Present Illness" noted "9/18/18 flu shot given in office in R[ight] arm. She reports it is painful. . . . Nothing seen on arm, but she reports the pain is severe and [b]ruising at the site when it happened." Id. Physical examination showed normal range of motion but "swelling of [upper extremity]." Id. at 13. These findings did not specify the right or left side. Dr. Johnson's assessment was "[p]ain at injection site." Id. She did not identify which arm was the injection site.

On October 1, 2018, approximately two weeks after vaccination, Petitioner called her PCP's office reporting that "she [was] having that same pain she had 2 weeks ago." Pet. Ex. 16 at 92. "She state[d] the pain [in] L[eft] arm is worse, not getting any better. Pain travels down arm to elbow and middle to upper back. Just her whole L[eft] side hurts. Pain is throbbing and achy constantly." Id. An electrocardiogram ("EKG") and X-rays of her left shoulder, cervical spine, and thoracic spine were ordered. Id. at 66, 69, 72, 92.

Petitioner presented to her PCP's office on October 10, 2018. Pet. Ex. 2 at 29. She reported that one month earlier, she received a flu shot and "for the next few days after injection she started to have left upper arm pain which then affected her posterior neck, trapezius, and interscapular area." Id. She rated her pain a 9/10. Id. The treating physician's assistant noted that the "[s]ymptoms presented after [intramuscular] flu injection 1 month ago and cannot rule out possibility of localized inflammatory process." Id. at 30. Petitioner was given a steroid injection and a cervical spine magnetic resonance imaging ("MRI") was ordered. Id.

On October 23, 2018, Petitioner presented for an initial physical therapy evaluation for left upper extremity pain. Pet. Ex. 8 at 11. History stated "[approximately] 1 month [history] of [left upper extremity pain] and increased [cervical spine] symptoms roughly an hour after following an [intramuscular] flu shot. This started out as achiness and turned into throbbing . . . pain only an hour after her shot." Id. The injection site was also noted to be "roughly 1.5" inferior to the nearest point of the acromion."[6] Id.

On November 6, 2018, Petitioner saw neurologist Dr. David Knox for a follow-up after receiving the steroid injection and cervical spine MRI. Pet. Ex. 2 at 12. Petitioner was "frustrated that the MRI was on her neck and not her shoulder." Id. The assessment was spondylosis of the cervical region and left shoulder pain. Id. at 13. Dr. Knox also noted that "[s]ymptoms presented after [intramuscular] flu injection 1 month ago and cannot rule out possibility of localized inflammatory process." Id. An MRI of her left shoulder was ordered. Id. at 10, 14.

An MRI of Petitioner's left shoulder was performed on November 13, 2018. Pet. Ex. 20 at 1. On her intake form, she checked the "left" shoulder and indicated "yes" to the inquiry "[r]ecent injection of this shoulder?" and wrote "9/18/18 flu vaccine administration of shot." Id. The MRI showed partial articular surface tears (rotator cuff tears) and "subacromial/subdeltoid

---

[6] The acromion is "the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder." Acromion, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=708 (last visited Jan. 19, 2023).

4

bursal space fluid consistent with bursitis and/or fluid tracking through the rotator cuff tear." Pet. Ex. 3 at 13.

Petitioner presented to her PCP's urgent care office on November 16, 2018. Pet. Ex. 14 at 72. "History of Present Illness" indicated "[left] shoulder pain since being given a flu shot on Sept[ember] 18th." Id. The assessment was left shoulder pain. Id. at 75.

Petitioner saw orthopedist, Dr. Wesley Cox at the Shoulder Center of Arkansas on December 18, 2018. Pet. Ex. 3 at 5. Petitioner reported pain in her left shoulder since "she [received] a flu shot" on September 18. Id. Specifically, she reported that her "pain began before she got home" from receiving the flu vaccine but that "she waited a [week] before contacting the provider." Id. In Dr. Cox's "Care Plan," he reported Petitioner was there for "L[eft] shoulder pain that started after a flu vaccine. Pain from injection was a throbbing, aching pain. There was bruising from injection." Id. at 7. He stated "[i]t makes it a lot less likely this is an infection when pain began immediately after flu injection." Id. Discussing how a flu shot could irritate the arm, he noted "[t]he most interesting thing is that the shoulder was hurting before she got home." Id. Dr. Cox "expect[ed] her to make a full recovery from flu vaccination." Id.

On March 12, 2019, Petitioner returned to her PCP's office. Pet. Ex. 4 at 5. She discussed with Ms. Sutfin, the nurse who administered Petitioner's vaccine on September 18, 2018, that "the pain in her L[eft] shoulder that ha[d] been present for the last 6 months . . . was caused by the flu vaccine that [Ms. Sutfin] gave to her." Id.

Petitioner returned to Dr. Cox on March 27, 2019. Pet. Ex. 3 at 9. Petitioner reported that the pain in her left shoulder "began following a flu shot in Sept[ember] 2018" and was now constant. Id. On September 2, 2020, Petitioner returned to Dr. Cox for ongoing left shoulder pain, who again indicated the "pain began after having a flu shot." Pet. Ex. 10 at 10. On March 2, 2021, Petitioner again presented to Dr. Cox, this time at the University of Arkansas Orthopedics & Sports Medicine Hospital, for a follow-up with "left shoulder pain" that "began after a flu injection." Pet. Ex. 13 at 12.

On February 21, 2022, Petitioner presented to MANA physical therapy for "her L[eft] shoulder issues [that] began over 2 years ago and [Petitioner] believe[d] that it occurred following a flu shot." Pet. Ex. 23 at 4.

### III.   PARTIES' CONTENTIONS

In her affidavit, Petitioner recalled the nurse "seemed in a hurry" when returning to the room to administer a flu shot at her six-month checkup. Pet. Ex. 19 at ¶ 2. The nurse "gave [her] the shot in [her] left shoulder while [she] was sitting in a chair, and [the nurse] was standing up." Id. "About 30-60 minutes after" leaving the doctor's office, Petitioner stated that her "shoulder started hurting badly." Id. at ¶ 3. Petitioner looked at her shoulder when she got home and observed "bruis[ing] where the shot was administered and on the back part of [her] left shoulder." Id. at ¶ 4. Petitioner reported the "pain became excruciating." Id.

5

Because the "pain didn't stop," Petitioner "made an appointment after a week to go back to Dr. [] Johnson." Pet. Ex. 19 at ¶ 4. After Dr. Johnson ordered an X-ray of Petitioner's neck and an EKG, Petitioner stated "[t]here appeared to be some confusion with their office where [her] pain was resonating." Id. at ¶ 5. She was eventually referred to Dr. Cox and after consultation about her left shoulder MRI results, she "felt relieved to get some clarification from all the severe pain [she] was experiencing." Id. at ¶ 9. When Petitioner started physical therapy, she explained the location of her pain "as there seemed to be some confusion about it." Id. at ¶ 13. Throughout her physical therapy sessions, she continued reporting "pain and throbbing in [her] left shoulder." Id.

In his Rule 4(c) Report, Respondent argued Petitioner has not established that she suffered a Table injury and thus is not entitled to compensation because "the record does not demonstrate that [P]etitioner's pain was limited to the shoulder in which the vaccine was given." Resp. Rept. at 1, 7-8. Respondent explained "there is conflicting evidence regarding both the site of vaccination, and the site of [P]etitioner's initial symptoms." Id. at 8-9. Respondent contended that even if the Court accepted the "corrected" vaccination record 17 months later, stating that the vaccine was given in Petitioner's left arm, "it would not explain why she initially reported that she had received a vaccine in her right arm—consistent with the original vaccine administration record—and complained of symptoms from the vaccine." Id. at 8; see also Resp. Response at 7 ("[P]etitioner can only prevail if the Court finds both that the original vaccination record was incorrect, and that the September 25, 2018 record was incorrect."). Accordingly, Respondent requests the Court find that "[P]etitioner received a flu vaccine in her right shoulder and that the pain in her left shoulder did not begin within forty-eight hours of being vaccinated." Resp. Response at 1.

## IV.   DISCUSSION

### A.   Applicable Legal Standards

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). But see Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." (quoting Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992))), recons. den'd after remand, 105 Fed. Cl. 353 (2012), aff'd mem., 503 F. App'x 952 (Fed. Cir. 2013).

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992))). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Despite the weight afforded to medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. Valenzuela v. Sec'y of Health & Hum. Servs., No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); see also Eng v. Sec'y of Health & Hum. Servs., No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them").

### B.     Finding of Fact Regarding Injection Site

Upon review of the entire record and consideration of the parties' briefs, the undersigned finds there is preponderant evidence that Petitioner's September 18, 2018 flu vaccination was administered in her left deltoid. Contrary to Respondent's argument, Petitioner has filed substantial evidence that the vaccine was administered in her left shoulder.

First, the amended vaccination record indicates so. Pet. Ex. 1 at 6. While Respondent argues "there is no explanation for how [the vaccination record] came to be corrected," the nurse that originally gave Petitioner the flu vaccine on September 18, 2018, noted that "upon review of the records, she realized there was a "documentation error." Resp. Response at 6; Pet. Ex. 1 at 6. She wrote that she "documented the [flu] vaccine was administered in the right deltoid when it was administered in the left deltoid." Pet. Ex. 1 at 6. The undersigned finds this evidence sufficient to explain how and why Ms. Sutfin amended the vaccination record. Additionally, there is no evidence to suggest the change was made to "appease [P]etitioner." Resp. Response at 6. The "contentious" encounter Respondent referred to was in March 2019, and the vaccination record was corrected in February 2020. Resp. Response at 6; Pet. Ex. 4 at 5; Pet. Ex. 1 at 6. Moreover, while Petitioner complained at the March 2019 visit that the "pain in her L[eft] shoulder . . . was caused by the flu vaccine that [the nurse] gave to her," Petitioner did not request Ms. Sutfin, or anyone, to correct the record on her behalf. See Pet. Ex. 4 at 5.

Most significantly, Petitioner's contemporaneous treatment records attribute Petitioner's left shoulder injury to the flu vaccine she received on September 18, 2018. This provides strong

7

corroborating evidence that Petitioner received her vaccination in her left arm. See, e.g., Parker v. Sec'y Health & Hum. Servs., No. 15-1331V, 2016 WL 3443929 (Fed. Cl. Spec. Mstr. May 13, 2016) (finding that a vaccine record recording administration in the left arm was incorrect based primarily on Petitioner's consistent attribution of his right shoulder condition to his vaccination throughout his treatment).

Petitioner consistently linked her left shoulder condition to her vaccination throughout her treatment. For example, on October 10, 2018, it was noted that Petitioner's "left upper arm pain" "presented after [intramuscular] flu injection 1 month ago." Pet. Ex. 2 at 29. Urgent care notes state "[left] shoulder pain since being given a flu shot." Pet. Ex. 14 at 72. Dr. Cox noted "L[eft] shoulder pain that started after a flu vaccine. Pain from injection was a throbbing, aching pain. There was bruising from injection." Pet. Ex. 3 at 7. And a physical therapist even identified the location of the injection site as "roughly 1.5" inferior to the nearest point of the acromion" when initially evaluating Petitioner's left shoulder. Pet. Ex. 8 at 11. Additionally, an X-ray and MRI were ordered of Petitioner's left shoulder but not of her right shoulder. Pet. Ex. 16 at 92; Pet. Ex. 14 at 155; Pet. Ex. 3 at 12; Pet. Ex. 2 at 10. Finally, Petitioner's sworn testimony is that the flu shot was administered in her left shoulder. Pet. Ex. 19 at ¶ 2, 4. The undersigned found no notation in any of Petitioner's treatment records that is contrary or inconsistent on this point.

### C. Findings of Fact Regarding Initial Symptoms

Upon review of the entire record and consideration of the parties' briefs, the undersigned finds there is preponderant evidence that Petitioner's initial symptoms were in her left shoulder and began within 48 hours of her vaccination. Respondent argues that Petitioner's records are insufficient to establish that Petitioner experienced pain in her left arm within 48 hours of vaccination; however, the undersigned disagrees.

Petitioner did not initially report pain in her right arm. When Petitioner presented to her PCP's office (the same office where she received her vaccine) on September 25, 2018, Dr. Johnson notated "9/18/18 flu shot given in office in R[ight] arm." Pet. Ex. 4 at 11. The undersigned disagrees with Respondent's characterization of this notation as indicating that Petitioner's initial report of pain was in her right arm. First, this was not the first time she reported pain. The day before, on September 24, six days after vaccination, Petitioner called her PCP stating the "[f]lu shot site [was] painful" and reported that it "bruised at first." Pet. Ex. 16 at 107. She did not specify the right or left arm. Next, there is no indication Petitioner conveyed to Dr. Johnson which arm it was other than the injection site. The undersigned finds the notation was likely made relying on the original vaccine record (as it was in the same office), which represented that the flu shot was administered in the right deltoid. This is consistent not only with the records from that day, in which Dr. Johnson was referring to Petitioner's right arm, but also with Petitioner's recollection of "confusion with their office [on] where [her] pain was." Pet. Ex. 4 at 11; Pet. Ex. 19 at ¶ 5.

The medical records first specifically document that Petitioner experienced symptoms in her left shoulder on October 1, 2018, two weeks after her flu vaccination, when Petitioner called her PCP stating that "she [was] having that same pain she had 2 weeks ago" and that "the pain

8

[in] L[eft] arm is worse, not getting any better." Pet. Ex. 16 at 92.  This suggests that the pain Petitioner initially sought treatment for two weeks ago, on September 24 and 25, was for her left shoulder, not her right shoulder.  The undersigned finds this evidence—in combination with the fact that her first two consultations did not clearly specify a side—highly persuasive that Petitioner's initial symptoms were in her left shoulder.

Moreover, even if the notation at issue did constitute that Petitioner initially presented with right shoulder pain, the subsequent medical records consistently reflect Petitioner experienced pain in her left shoulder within 48 hours of her flu vaccination.  For example, physical therapy notes state left upper extremity pain began "roughly an hour after . . . flu shot." Pet. Ex. 8 at 11.  Dr. Cox noted that that her "shoulder was hurting before she got home" and that her "pain began immediately after flu injection." Pet. Ex. 3 at 7.  Additionally, Petitioner averred that "[a]bout 30-60 minutes after" leaving the doctor's office, her "shoulder started hurting badly" and noticed bruising when she got home.  Pet. Ex. 19 at ¶¶ 3-4.  The undersigned found no notation in any of Petitioner's treatment records that is contrary or inconsistent on this point.

## V.   CONCLUSION

In light of all of the above and in view of the record as a whole, the undersigned finds by preponderant evidence that (1) Petitioner received the flu vaccine in her left shoulder, and (2) her initial symptoms were in her left shoulder within 48 hours of vaccination.

The following is **ORDERED**:

Respondent shall file either (1) an Amended Rule 4(c) Report, reflecting the Fact Ruling, or (2) if Respondent wishes to engage in settlement negotiations, a status report indicating such, **by Monday, March 6, 2023**.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master
